UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

COUNTY OF STANISLAUS,

                Plaintiff,

        v.

TRAVELERS INDEMNITY COMPANY;
and DOES 1 through 50,
inclusive,

                Defendant.

CIV. NO. 1:14-00666 WBS SMS

MEMORANDUM AND ORDER RE: CROSS-
MOTIONS FOR SUMMARY JUDGMENT

----oo0oo----

        This action seeks to resolve disputes regarding the
coverage due under a comprehensive general liability policy
issued to plaintiff County of Stanislaus by the Insurance Company
of the Pacific Coast, which was a former entity of defendant
Travelers Indemnity Company.  Pursuant to Federal Rule of Civil
Procedure 56, both parties move for summary judgment to resolve
defendant's obligations under the policy.

I.   Factual and Procedural Background

        From 1970 until 1990, plaintiff operated the Greer

1

1  Landfill in the eastern edge of the San Joaquin Valley adjacent

2  to the Tuolumne River. (Docket No. 28-13.) The Greer Landfill,

3  which closed in 1995, contains approximately 4.5 million tons of

4  residential, commercial, industrial, construction, and demolition

5  waste that was deposited into excavated cells in the ground.

6  (Id.) The policy at issue in this case was in effect from only

7  October 13, 1972 to October 13, 1975. (Docket No. 28-8.) The

8  policy excludes coverage for contamination, but reinstates

9  coverage for "sudden and accidental" discharges. (Id.)

10     In 1985, groundwater degradation was identified at the

11  landfill and efforts have been undertaken to remediate the

12  groundwater contamination since at least 1991. (Docket No. 28-

13  13.) In 2009, the California Regional Water Quality Control

14  Board ("CRWQCB") issued an order identifying plaintiff's "Waste

15  Discharge Requirements." (Id.) Finding that the "extent of the

16  groundwater contamination has not been defined" and that the

17  existing "landfill gas and groundwater extraction systems are not

18  adequate," the CRWQCB issued a Cease and Desist Order in 2011.

19  (Docket No. 32-3 at STATRAV2316-STATRAV2318.)

20     On August 5, 2011, plaintiff initiated an action in

21  state court against the City of Modesto (the "City") seeking

22  damages against the City based on contamination at the Greer

23  Landfill. On August 24, 2011, the City filed a Cross-Complaint

24  against plaintiff seeking indemnity and damages incurred as a

25  result of the contamination. Plaintiff informed defendant of its

26  lawsuit against the City five months after filing it and then

27  tendered the defense of the City's Cross-Complaint on January 27,

28  2012. (Barillari Decl. ¶¶ 3, 5 (Docket No. 28-7).) Defendant

2

1    accepted the tender subject to a complete reservation of rights

2    and informed plaintiff that the "defense may be conducted by

3    appropriately qualified counsel of the County of Stanislaus's

4    choice, in any manner deemed appropriate to protect the interests

5    of the County."  (Docket No. 28-15.)

6         While defendant has paid legal fees incurred in

7    defending against the City's Cross-Complaint, it has not paid any

8    of the non-legal environmental consultant invoices plaintiff

9    submitted.  Plaintiff initiated this action in state court

10   seeking declaratory relief to resolve defendant's obligations

11   under the policy and alleging claims for breach of contract and

12   breach of the implied covenant of good faith and fair dealing.

13   (Docket No. 1.)  Defendant removed the action to federal court,

14   and the parties now seek summary judgment resolving whether

15   defendant has a duty to defend plaintiff and, if so, whether the

16   non-legal environmental consultant costs are defense costs.

17   III. <u>Analysis</u>

18        A.   <u>Legal Standard</u>

19        Summary judgment is proper "if the movant shows that

20   there is no genuine dispute as to any material fact and the

21   movant is entitled to judgment as a matter of law."  Fed. R. Civ.

22   P. 56(a).  A material fact is one that could affect the outcome

23   of the suit, and a genuine issue is one that could permit a

24   reasonable jury to enter a verdict in the non-moving party's

25   favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

26   (1986).  The party moving for summary judgment bears the initial

27   burden of establishing the absence of a genuine issue of material

28   fact and can satisfy this burden by presenting evidence that

                                    3

1    negates an essential element of the non-moving party's case.

2    Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

3    Alternatively, the moving party can demonstrate that the non-

4    moving party cannot produce evidence to support an essential

5    element upon which it will bear the burden of proof at trial.

6    Id.

7         Once the moving party meets its initial burden, the

8    burden shifts to the non-moving party to "designate 'specific

9    facts showing that there is a genuine issue for trial.'"  Id. at

10   324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,

11   the non-moving party must "do more than simply show that there is

12   some metaphysical doubt as to the material facts."  Matsushita

13   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

14   "The mere existence of a scintilla of evidence . . . will be

15   insufficient; there must be evidence on which the jury could

16   reasonably find for the [non-moving party]."  Anderson, 477 U.S.

17   at 252.

18        In deciding a summary judgment motion, the court must

19   view the evidence in the light most favorable to the non-moving

20   party and draw all justifiable inferences in its favor.  Id. at

21   255.  "Credibility determinations, the weighing of the evidence,

22   and the drawing of legitimate inferences from the facts are jury

23   functions, not those of a judge . . . ruling on a motion for

24   summary judgment . . . ."  Id.  On cross-motions for summary

25   judgment, the court "must review the evidence submitted in

26   support of each cross-motion [in a light most favorable to the

27   non-moving party] and consider each party's motions on their own

28   merits."  Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090,

4

1  1097 (W.D. Wash. 2004).

2      B.   Duty to Defend and the Pollution Exclusion

3            An insurer's duty to defend "runs to claims that are

4  merely potentially covered, in light of facts alleged or

5  otherwise disclosed" and "extends to all specified harm that may

6  possibly have been caused by an included occurrence." Aerojet-

7  Gen. Corp. v. Transp. Indem. Co., 17 Cal. 4th 38, 58 (1997)

8  ("Aerojet").  "[T]he insurer must defend in some lawsuits where

9  liability under the policy ultimately fails to materialize; this

10  is one reason why it is often said that the duty to defend is

11  broader than the duty to indemnify." Montrose Chem. Corp. v.

12  Superior Court, 6 Cal. 4th 287, 299 (1993).  "Any doubt as to

13  whether the facts establish the existence of the defense duty

14  must be resolved in the insured's favor." Id. at 299-300.

15            The duty to defend "arises as soon as tender is made"

16  and is "discharged when the action is concluded" unless it is

17  "extinguished earlier" because the insurer shows "that no claim

18  can in fact be covered." Aerojet, 17 Cal. 4th at 58.  "[I]n an

19  action wherein none of the claims is even potentially covered

20  because it does not even possibly embrace any triggering harm of

21  the specified sort within the policy period caused by an included

22  occurrence, the insurer does not have a duty to defend." Id. at

23  59.

24            "An insurer is entitled to limit its coverage to

25  defined risks, and if it does so in clear language, [the court]

26  will not impose coverage where none was intended." Am. States

27  Ins. Co. v. Sacramento Plating, Inc., 861 F. Supp. 964, 968 (E.D.

28  Cal. 1994) (quoting Titan Corp. v. Aetna Casualty & Sur. Co., 22

Cal. App. 4th 457, 469 (4th Dist. 1994)) (alteration in

original).  Here, the policy excluded coverage for contamination,

but reinstated coverage if the contamination was "sudden and

accidental":

> It is agreed that the insurance does not apply to
> bodily injury or property damage arising out of the
> discharge, dispersal, release or escape of smoke,
> vapors, soot, fumes, acids, alkalis, toxic chemicals,
> liquids or gases, waste materials or other irritants,
> contaminants or pollutants into or upon land, the
> atmosphere or any watercourse or body of water, but
> this exclusion does not apply if such discharge,
> dispersal, release or escape is sudden and accidental.

(Docket No. 28-8.)

　　　　When addressing similar exclusions, California

appellate courts have held that the insured "establishes that

[the insurer] is obligated to defend . . . if there is any

potential that the release or escape of at least some of the

pollutants was 'sudden and accidental.'"  Vann v. Travelers

Cos., 39 Cal. App. 4th 1610, 1616 (1st Dist. 1995); A-H Plating,

Inc. v. Am. Nat'l Fire Ins. Co., 57 Cal. App. 4th 427, 437

(1997); accord Arrowood Indem. Co. v. Bel Air Mart, No. 2:11-CV-

00976 JAM-AC, 2014 WL 841314, at *5 (E.D. Cal. Mar. 4, 2014);

Bolton v. Lumbermans Mut. Cas. Co., No. 05-1109 SC, 2006 WL

193519, at *4 (N.D. Cal. Jan. 23, 2006) ("[S]o long as [the

insurer] is unable to conclusively establish that the underlying

claim cannot fall within the ambit of the policies, it will be

bound to defend Plaintiff.").  As the California Supreme Court

has more generally explained in the context of a dispute about

the duty to defend, "the insured must prove the existence of a

1    potential for coverage, while the insurer must establish the

2    absence of any such potential."  Montrose Chem. Corp., 6 Cal. 4th

3    at 300.[1]

4         "[I]n the phrase, 'sudden and accidental,' 'accidental'

5    conveys the sense of an unexpected and unintended event, while

6    'sudden' conveys the sense of an unexpected event that is abrupt

7    or immediate in nature."  Shell Oil Co. v. Winterthur Swiss Ins.

8    Co., 12 Cal. App. 4th 715, 755 (1st Dist. 1993).  Courts have

9    repeatedly held that "sudden and accidental" cannot include

10   gradual pollution.  See, e.g., FMC Corp. v. Plaisted & Cos., 61

11   Cal. App. 4th 1132, 1146 (1998); ACL Techs., Inc. v. Northbrook

12   Prop. & Cas. Ins. Co., 17 Cal. App. 4th 1773, 1787 (4th Dist.

13   1993); Am. States Ins. Co. v. Sacramento Plating, Inc., 861 F.

14   Supp. 964, 970 (E.D. Cal. 1994).  As a "coverage provision" the

15   sudden and accidental exception to the pollution exclusion must

16

17       [1]   Defendant relies on Aydin Corp. v. First State Ins.
     Co., 18 Cal. 4th 1183, 1194 (1998), to argue that plaintiff has
18   the burden of proving a sudden and accidental discharge.  The
     California Supreme Court in that case, however, held that "in an
19   action seeking indemnity under a standard commercial general
     liability insurance policy, once the insurer carries its burden
20   of proving that the general pollution exclusion applies, the
     insured bears the burden of proving that a claim comes within the
21   'sudden and accidental' exception."  Aydin Corp., 18 Cal. 4th at
     1194 (emphasis added).  The insured in Aydin Corp. did not seek
22   defense costs and the Court did not address allocation of the
     burden of proof with respect to the duty to defend.  See id. at
23   1194 n.6 ("We note that some Courts of Appeal have held that
     regardless of which party bears the burden of proof when
24   indemnification is at issue, when the defense duty is implicated,
     the insurer is obligated to defend its insured in an underlying
25   action if there is any potential that the release or escape of at
     least some of the pollutants was 'sudden and accidental.'  Since
26   the duty to defend is not at issue in this case, we express no
     opinion as to which party should bear the burden of proof in that
27   context.") (citations omitted).

28
                                  7

1  be "construed broadly in favor of the insured." State v.

2  Allstate Ins. Co., 45 Cal. 4th 1008, 1018 (2009).

3        In determining whether the sudden and accidental

4  exception applies, "the focus of analysis must be on the

5  particular discharge or discharges that gave rise to [the]

6  property damage," thus the court must "look[] first to the

7  underlying claims to determine the polluting event." Id. at

8  1018-19.  With a landfill like the one at issue in this case, the

9  California Supreme Court has distinguished between (1) the

10  initial discharge of the waste into the landfill; and (2) "the

11  subsequent migration of wastes from the landfill to other

12  property." Id. at 1019.  The parties in this case do not dispute

13  that the City's Cross-Complaint could seek damages for either of

14  these discharges.

15        In Standun, Inc. v. Fireman's Fund Ins. Co., the

16  insured operated a manufacturing facility in Compton and

17  knowingly sent waste to the landfill on a regular basis.  62 Cal.

18  App. 4th 882 (2d Dist. 1998).  The insured unsuccessfully argued

19  that even though the initial discharges were not sudden and

20  accidental, "there may have been subsequent sudden and accidental

21  discharges of the pollutants from the landfill into the

22  environment." Id. at 888.  The Second Appellate District

23  rejected this theory because the underlying environmental actions

24  sought to hold the insured liable for the discharges into the

25  landfill and thus even if subsequent events were sudden and

26  accidental they "were not the basis of the underlying claims . .

27  . and were therefore irrelevant." Id.  The court explained,

28  "Where hazardous waste material is deposited directly into a

1  landfill, the relevant discharge of pollutants for purposes of

2  the pollution exclusion is the initial release of the hazardous

3  waste into the landfill, not the subsequent release of pollutants

4  from the landfill into the water, air, and adjoining land." Id.

5  at 891.

6          The California Supreme Court subsequently distinguished

7  Standun, Inc. and explained that a subsequent release of the

8  pollutants could be the relevant discharge under certain

9  circumstances.  In State v. Allstate Ins. Co., the state

10 maintained "open, unlined evaporation ponds to contain the

11 hazardous waste" and intentionally deposited hazardous waste into

12 those ponds with the expectation that the waste would remain in

13 the ponds.  45 Cal. 4th at 1015.  It turned out what the state

14 believed was "an impermeable layer of rock" was actually

15 "decomposed granite and fractured bedrock," which allowed

16 chemical pollutants to seep into the groundwater.  Id. at 1015-

17 16.

18         In the underlying environmental action, "[t]he State

19 was not held liable for polluting the evaporation ponds," and

20 thus it did not matter that the initial deposit of the waste into

21 the ponds was neither sudden nor accidental.  Id. at 1018-19.

22 Instead, "the State's liability was based on its having sited,

23 designed, built, and operated the [] facility in such a negligent

24 manner as to allow hazardous chemicals to escape from the

25 evaporation ponds (by both seepage and overflow) into the

26 surrounding environment."  Id. at 1018.  The relevant discharge

27 for purposes of the sudden and accidental exception was thus "the

28 release of wastes from the site when, because of the State's

9

1   negligence, the site failed to contain them properly." Id. at
2   1020.

3        The Court further explained, "When, as in Standun,
4   pollutants are deposited directly onto land or into water,
5   without any attempt at containment, their further migration may
6   reasonably be viewed as an aspect of property damage rather than
7   an additional release or discharge; arguably, the only
8   'discharge' to be considered in such a case is the initial
9   deposit." Id. at 1020.  In contrast, the unlined evaporation
10  ponds were "intended and expected" to contain the hazardous
11  waste, even though they were "poorly sited and designed for that
12  purpose." Id.  "The instances of seepage and overflow from the
13  ponds were therefore liability-causing events, not merely aspects
14  of the property damage as in Standun." Id. at 1021.

15              1.   Sudden and Accidental Discharge After the Initial
16                   Deposit

17       Relying on Allstate Insurance Co., plaintiff first
18  seeks to establish defendant's duty to defend as a matter of law
19  based on the possibility that a sudden and accidental discharge
20  occurred during the coverage period when flooding caused the
21  groundwater to seep into the deposited waste and thereby
22  contaminate the groundwater.  Under this theory, plaintiff must
23  show the possibility that it intended the landfill to contain the
24  waste, but "sited, designed, built, [or] operated the [Greer
25  Landfill] facility in such a negligent manner as to allow
26  hazardous chemicals to escape from the [landfill cells]."
27  Allstate Ins. Co., 45 Cal. 4th at 1018.

28              a.   Intent for Landfill Cells To Contain Waste

1    In Allstate Insurance Co., the California Supreme Court
2    found that waste was placed into containment in evaporation ponds
3    because the state "intended and expected" the layer of rock
4    beneath the ponds to contain the waste.  Id. at 1015, 1020.
5    Similarly, in Patz v. St. Paul Fire & Marine Ins. Co., the
6    Seventh Circuit found that an "evaporation pit was a containing
7    structure, despite its lack of artificial materials" lining the
8    bottom of the pit.  15 F.3d 699 (7th Cir. 1994).  The Seventh
9    Circuit found that the unlined pit was a "containing structure"
10   because the insureds believed that the "clay composition of the
11   soil . . . would stop the water" from "leaching through the
12   bottom of the pit."  Id. at 704.  These cases show that an
13   insured could believe that waste was placed into containment even
14   though the landfill is unlined.

15   Here, the CRWQCB's "Waste Discharge Requirements" for
16   the Greer Landfill issued in 1970 conditioned plaintiff's and the
17   City's ability to operate the landfill on the limitation that the
18   deposited waste would "not cause a pollution of ground or surface
19   waters."  (Docket No. 32-6.)  It further prohibited the
20   "discharge of solid or liquid wastes, including leachate, to
21   surface or underground waters."  (Id.)

22   Although the CRWQCB recognized that "a portion of this
23   parcel may be flooded on occasion," it seemed to believe that
24   "discharge to ground or surface waters" would be avoided so long
25   as waste was not "deposited below the elevation of seventy-seven
26   feet above sea level" and "disposal trenches [were] bottomed
27   above the anticipated high ground water level including the
28   capillary fringe and surface waters [were] diverted around the

11

1   disposal site." (Id. at 1, 2, app. A.)  Plaintiff has therefore

2   shown the possibility that it, along with the CRWQCB, believed it

3   was placing waste into containment if the cells were not

4   excavated too close to the groundwater.

5                    b.   Negligent Excavation

6            Plaintiff must also show the possibility that it

7   accidentally excavated the cells too close to the groundwater.

8   Plaintiff put forth evidence that the County purchased parcels of

9   land and excavated those parcels during the coverage period and

10  that waste was deposited into the landfill during the coverage

11  period. (E.g., Docket No. 32-3 at STATRAV2398-2411, STATRAV2415-

12  2452.)  Tom Brower, who worked at the Greer Landfill during the

13  1970's, indicates that he "saw the cells being excavated for the

14  trash to be deposited in" and that the contractor "excavate[d]

15  into wet clay during the constructions of the cells at the Site."

16  (Bower Decl. ¶¶ 3, 7-8 (Docket No. 37-13).)[2]  Bower explains

17  ─────────────
        [2]      Defendant objects to consideration of Bower's

18  declaration because Bower was never identified in discovery,
    which closed on June 17, 2015.  Federal Rule of Civil Procedure

19  37(c)(1) provides:

20       If a party fails to provide information or identify a
         witness as required by Rule 26(a) or (e), the party is

21       not allowed to use that information or witness to
         supply evidence on a motion, at a hearing, or at a

22       trial, unless the failure was substantially justified
         or is harmless.  In addition to or instead of this

23       sanction, the court, on motion and after giving an
         opportunity to be heard: (A) may order payment of the

24       reasonable expenses, including attorney's fees, caused
         by the failure; (B) may inform the jury of the party's

25       failure; and (C) may impose other appropriate
         sanctions, including any of the orders listed in Rule

26       37(b)(2)(A)(i)-(vi).

27

28  In determining whether the sanction of exclusion is merited, the

                                    12

1   that, "from his experience excavating in the Central Valley . . .

2   when you hit clay in [the] area, you are just above the

3   groundwater, which presents a danger of the groundwater rising

4   into the excavated area." (Id. ¶ 9.)  Brower's testimony, along

5   with the CRWQCB's requirement that the trenches be "bottomed

6   above the anticipated high ground water level," establishes the

7   possibility that plaintiff accidentally excavated too deep during

8   the coverage period.

9            c.   Flooding During Coverage Period

10          Plaintiff also put forth evidence showing "above-normal

11  rainfall" in February 1973, (Cal. Dep't of Water Res. Bulletin

12  No. 69-73, California High Water 1972-1973 at iii, 1, 7, (Docket

13  No. 37-10)), which resulted in the cresting of the Toulumne River

14  on February 12, 1973, (see Nat'l Weather Serv.'s Advanced

15  Hydrologic Prediction Servs. (Docket No. 37-9 at 3) (showing that

16  the Toulumne River crested at 49.55 on February 12, 1973).)[3]  The

17  ─────────────────────────────────────────────

18  court must consider "1) the public's interest in expeditious
    resolution of litigation; 2) the court's need to manage its
    docket; 3) the risk of prejudice to the defendants; 4) the public
19  policy favoring disposition of cases on their merits; 5) the
    availability of less drastic sanctions." Wendt v. Host Int'l,
20  Inc., 125 F.3d 806, 814 (9th Cir. 1997).

21          Plaintiff's counsel represents that he did not discover
    Bower's identity until September 25, 2015. (Supp. Syz Decl. ¶ 12
22  (Docket No. 37-11).)  Although plaintiff's counsel should have
    been more diligent in performing discovery, the untimely
23  disclosure in this case does not merit the drastic sanction of
    exclusion, especially when three months remain before trial.
24  (See Docket No. 36.)  To address any prejudice defendant may
    suffer at trial from the untimely disclosure, the court will
25  reopen discovery to allow defendant to depose Bower.

26          [3]   For purposes of the motions before the court, the court
27  takes judicial notice of the above-normal rainfall recorded in
    the Department of Water Resources Bulletin No. 69-73 (Docket No.
28  37-10) and the cresting of the Toulumne River memorialized in the

1  Greer Landfill is adjacent to the Toulumne River, (Docket No. 32-

2  6 at 1), and the groundwater beneath the landfill is in

3  "hydraulic communication" with the river and thus can rise as the

4  river rises, (Docket No. 32-3 at STATRAV2317).  According to

5  plaintiff, when the river crested in February 1973, groundwater

6  elevations potentially flooded the buried waste at the landfill

7  and thereby potentially resulted in a sudden and accidental

8  discharge of pollutants into the groundwater.

9        The CRWQCB's 2009 Cease and Desist Order corroborates

10  the possibility that contamination occurred when the groundwater

11  levels raised: "It is highly probable that groundwater rises into

12  the waste mass at times."  (Id.)  Plaintiff has thus established

13  the possibility that the groundwater level rose during the

14  coverage period due to above-average rainfall and was potentially

15  contaminated when it came in contact with the waste.

16                    d.   Defendant's Showing

17        Plaintiff has put forth sufficient circumstantial

18  evidence establishing the possibility that the Greer Landfill was

19  intended to contain the waste, but was suddenly contaminated when

20  it seeped into the cells during heavy rain because plaintiff had

21  accidentally excavated the cells too close to the groundwater.

22  ─────────────────────────────────────────────────────────

23  National Weather Services Advanced Hydrologic Prediction Services
(Docket No. 37-9).  See Fed. R. Evid. 201(b) ("The court may
judicially notice a fact that is not subject to reasonable

24  dispute because it:  . . . (2) can be accurately and readily
determined from sources whose accuracy cannot reasonably be

25  questioned."); Sanchez v. City of Fresno, Civ. No. 1:12-00428

26  LJO, 2014 WL 2042058, at *2 (E.D. Cal. May 16, 2014) (taking
judicial notice of weather information from the National Climate

27  Data Center).  Although defendant disputes the inferences to be
drawn from this evidence, it does not dispute the accuracy of the

28  information in these documents.

                              14

1  To negate plaintiff's showing of a potential for coverage,

2  defendant "must establish <u>the absence of any such potential</u>."

3  <u>Montrose Chem. Corp.</u>, 6 Cal. 4th at 300.  "Facts merely tending

4  to show that the claim is not covered, or may not be covered, but

5  are insufficient to eliminate the possibility that resultant

6  damages (or the nature of the action) will fall within the scope

7  of coverage, [] add no weight to the scales."   <u>Id.</u>

8       Defendant primarily argues that plaintiff should have

9  known contamination of the groundwater could occur because the

10 landfill was unlined.  Such evidence is insufficient to

11 conclusively show that the discharge was not accidental as a

12 matter of law.  <u>See</u> <u>Allstate Ins. Co.</u>, 45 Cal. 4th at 1028

13 ("Evidence the State should have known flooding was likely, and

14 should have taken additional measures against it, is insufficient

15 to prove, as an undisputed fact, that a waste discharge due to

16 flooding was expected and therefore nonaccidental.").

17      Defendant also cannot extinguish its duty to defend

18 based on plaintiff's inability to prove its right to indemnity at

19 this stage in the litigation.  While plaintiff is entitled to a

20 defense under the policy upon a showing the possibility of a

21 sudden and accidental discharge, it is entitled to <u>indemnity</u>

22 under the policy only if it proves "that a claim comes within the

23 'sudden and accidental' exception."  <u>Aydin Corp.</u>, 18 Cal. 4th at

24 1194 (emphasis added).  There is little question that plaintiff

25 cannot sustain this burden at summary judgment based on the

26 evidence before the court, which establishes only the possibility

27 of coverage.

28      As the California Supreme Court has explained, however,

1  forcing plaintiff to establish coverage prior to resolution of
2  the underlying action could prejudice the insured.  Montrose
3  Chem. Corp., 6 Cal. 4th at 301.  "For example, when the third
4  party seeks damages on account of the insured's negligence, and
5  the insurer seeks to avoid providing a defense by arguing that
6  its insured harmed the third party by intentional conduct, the
7  potential that the insurer's proof will prejudice its insured in
8  the underlying litigation is obvious."  Id. at 302.  Forcing
9  plaintiff to establish that it negligently excavated the landfill
10  cells to establish coverage could undoubtedly prejudice it in the
11  City's underlying action against it, and thus the court cannot
12  resolve indemnity at this time.  Id.; Montrose Chem. Corp. v.
13  Superior Court, 25 Cal. App. 4th 902, 907-11 (2d Dist. 1994).

14               e.  Conclusion

15          Because plaintiff has carried its burden of showing the
16  possibility of coverage under the sudden and accidental exception
17  to the pollution exclusion and defendant has not established the
18  absence of a potential for coverage as a matter of law, defendant
19  has a duty to defend plaintiff under the policy.  Montrose Chem.
20  Corp., 6 Cal. 4th at 301.  Accordingly, the court must grant
21  plaintiff's motion for summary judgment with respect to
22  defendant's duty to defend and deny defendant's motion for
23  summary judgment on that issue.

24          2.  Sudden and Accidental Discharge at the Time of
25              Deposit

26          Plaintiff also seeks to show the possibility that a
27  sudden and accidental discharge occurred when the waste was
28  initially deposited into the landfill cells because the cells

                                16

1   were accidentally excavated so deep that deposited waste was

2   immediately exposed to the groundwater.  Under this theory,

3   plaintiff relies primarily on Kleinfelder's May 23, 2007 "South

4   Area Groundwater Investigation Report" (the "Kleinfelder

5   Report"), which states:

> An employee from Stanislaus County, who was present at
> the landfill in 1985 and 1986, reported that
> excavations in the landfill area north of Jantzen Road
> were dug to depths of approximately 80 feet below
> grade, which would have potentially immersed landfill
> waste in the groundwater table when groundwater
> elevations were high.  In the southern area, waste
> cells were also dug in the summer close to
> groundwater.

12  (Docket No. 32-3 at STATRAV7233.)  Although this description

13  refers to excavations in 1985 and 1986, which is outside of the

14  coverage period, plaintiff argues that the statement is

15  circumstantial evidence about how the landfill was excavated ten

16  years earlier during the coverage period.

17           Putting aside the attenuated relevance of evidence

18  about excavations that occurred a decade past the coverage

19  period, defendant objects to consideration of the Kleinfelder

20  Report on the ground that it contains inadmissible hearsay within

21  hearsay.  Because the Kleinfelder Report is central to

22  plaintiff's theory of a sudden and accidental discharge at the

23  time of the initial deposit of the waste, the court provided

24  plaintiff with the opportunity to reply to defendant's

25  evidentiary objections and resubmit any evidence in light of

26  them.  (See Docket No. 35.)

27           "Hearsay 'is a statement, other than one made by the

28  declarant while testifying at the trial or hearing, offered in

                                    17

1  evidence to prove the truth of the matter asserted.'" <u>Wagner v.</u>

2  <u>County of Maricopa</u>, 747 F.3d 1048, 1056 (9th Cir. 2013) (quoting

3  Fed. R. Evid. 801(c)).  "Hearsay within hearsay is not excluded

4  by the rule against hearsay if each part of the combined

5  statements conforms with an exception to the rule."  Fed. R.

6  Evid. 805.[4]

7       Rule 801(d)(2) provides that an admission by the

8  opposing party, including a statement made "by the party's agent

9  or employee on a matter within the scope of that relationship and

10  while it existed," is not hearsay.  The Kleinfelder Report,

11  however, was prepared at the behest of plaintiff and it is

12  plaintiff's own employee who described the excavations from 1985

13  to 1986.  (<u>See</u> Crandall Decl. ¶ 3 (Docket No. 37-14).)  As is

14  clear in Rule 801(d)(2), a party "may not offer his own

15  statements as party admissions, as only statements offered

16  against a party-opponent are admissible under Federal Rule of

17  Evidence 801(d)(2)."  <u>United States v. Castro-Cabrera</u>, 534 F.

18  Supp. 2d 1156, 1162 (C.D. Cal. 2008).  Nor can plaintiff

19  characterize the CRWQCB as the "opposing party" at the time of

20  the investigation and somehow construe the report as against

21  plaintiff's interest vis-à-vis the CRWQCB.

22       The Kleinfelder Report also does not become a public

23  record subject to the exception in Rule 803(8) merely because the

24  CRWQCB summarized the findings from the Kleinfelder Report in its

25  _____

26       [4]   Plaintiff's reliance on a case discussing California's
   "invited error doctrine" in the context of a bar to federal-court
27  habeas relief of a state conviction is misplaced.  (<u>See</u> Pl.'s
   Evidentiary Br. at 12 (citing <u>Jackson v. Herndon</u>, Civ. No. 09-
28  01145 RSWL, 2009 WL 3122552, at *5 (C.D. Cal. Sept. 25, 2009)).

1    documents.  (E.g., Docket No. 20-13 ¶ 28); see Fed. R. Evid.

2    803(8) ("A record or statement of a public office if: (A) it sets

3    out: (i) the office's activities; (ii) a matter observed while

4    under a legal duty to report, but not including, in a criminal

5    case, a matter observed by law-enforcement personnel; or (iii) in

6    a civil case or against the government in a criminal case,

7    factual findings from a legally authorized investigation; and (B)

8    the opponent does not show that the source of information or

9    other circumstances indicate a lack of trustworthiness.").

10          Although Michael Franck, the employee interviewed for

11   the Kleinfelder Report, is now deceased, (Supp. Aggers Decl. ¶ 8

12   (Docket No. 37-12)), his statements do not come within any of

13   Rule 804's hearsay exceptions when a declarant is unavailable.

14   While his statement could be viewed as against plaintiff's

15   interest, Rule 804(b)(3) allows admission of a statement against

16   interest by an unavailable witness when that statement is "so

17   contrary to the declarant's proprietary or pecuniary interest or

18   had so great a tendency to invalidate the declarant's claim

19   against someone else or to expose the declarant to civil or

20   criminal liability."  Fed. R. Evid. 804(b)(3)(A).  "A statement

21   is against pecuniary and proprietary interest when it threatens

22   the loss of employment, or reduces the chances for future

23   employment, or entails possible civil liability."  Gichner v.

24   Antonio Troiano Tile & Marble Co., 410 F.2d 238, 242 (D.C. Cir.

25   1969).  Although Franck reported that excavations were dug too

26   deep, nothing in the record suggests that Franck was responsible

27   for those excavations or that the statements were against his

28   pecuniary interest for some other reason.

                                    19

1        Lastly, the court finds that the hearsay statement

2   within the Kleinfelder Report would not be admissible under Rule

3   807's residual exception, which provides:

4

5        Under the following circumstances, a hearsay statement
         is not excluded by the rule against hearsay even if
6        the statement is not specifically covered by a hearsay
         exception in Rule 803 or 804:

7

8        (1) the statement has equivalent circumstantial
         guarantees of trustworthiness;

9        (2) it is offered as evidence of a material fact;

10

11       (3) it is more probative on the point for which it is
         offered than any other evidence that the proponent can
         obtain through reasonable efforts; and

12

13       (4) admitting it will best serve the purposes of these
         rules and the interests of justice.

14   Fed. R. Evid. 807(a). "Under the Rule, a district [court] has

15   the discretion to admit a hearsay statement in 'exceptional

16   circumstances' so long as it meets the Rule's requirements."

17   Draper v. Rosario, Civ. No. 2:10-32 KJM EFB, 2014 WL 1664917, at

18   *4 (E.D. Cal. Apr. 25, 2014) (citing United States v. Bonds, 608

19   F.3d 495, 500-01 (9th Cir. 2010)). "The most important

20   consideration is whether the hearsay has circumstantial

21   guarantees of trustworthiness 'equivalent to those present in the

22   traditional exceptions to the hearsay rule.'" Id. (quoting Fong

23   v. Am. Airlines, Inc., 626 F.2d 759, 763 (9th Cir. 1980)).

24       Plaintiff argues that the statement by the employee has

25   "adequate alternative assurance of reliability," Giles v.

26   California, 554 U.S. 353, 389 (2008), because it occurred during

27   an administrative investigation. Plaintiff, however, initiated

28

1   the investigation that culminated in the Kleinfelder Report and

2   there is no indication that the interview was done in conjunction

3   with the CRWQCB.  The statement, which is not even in the

4   employee's own words, was not made under oath or recorded.  See

5   United States v. Sanchez-Lama, 161 F.3d 545, 547-48 (9th Cir.

6   1998) (holding that the district court erred in excluding video-

7   taped statements that were made under oath by witnesses who were

8   later deported).  Nor is an employee's statement about

9   excavations in 1985 and 1986 "more probative" about how the

10  landfill was excavated during the coverage period of 1972 to 1975

11  "than any other evidence that the proponent can obtain through

12  reasonable efforts."  Fed. R. Evid. 807(a)(3).

13          Because Franck's statements are inadmissible hearsay,

14  the court cannot consider them in deciding plaintiff's motion for

15  summary judgment.  See Fed. R. Civ. P. 56(c)(2) ("A party may

16  object that the material cited to support or dispute a fact

17  cannot be presented in a form that would be admissible in

18  evidence."); Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d

19  1110, 1122 (E.D. Cal. 2006) ("[C]urrent law in the Ninth Circuit

20  is arguably that the rule against hearsay, Fed. R. Evid. 802,

21  applies to evidence submitted in support of and in opposition to

22  a motion for summary judgment.").  Plaintiff has therefore failed

23  to establish the possibility that a sudden and accidental

24  discharge occurred at the time of the initial deposit of the

25  waste.

26          C.   Site Investigations as Defense Costs

27          Having found that defendant owes plaintiff a duty to

28  defend, the parties next dispute whether plaintiff's site

investigation expenses constitute defense costs.  "In fulfilling

its duty [to defend, the insurer] must undertake reasonable and

necessary efforts to avoid or at least minimize liability."

Aerojet, 17 Cal. 4th at 60.  The California Supreme Court has

held that "the insured's site investigation expenses constitute

defense costs" only if the following requirements are met:

> First, the site investigation must be conducted within
> the temporal limits of the insurer's duty to defend,
> i.e., between tender of the defense and conclusion of
> the action.  Second, the site investigation must
> amount to a reasonable and necessary effort to avoid
> or at least minimize liability.  Third and final, the
> site investigation expenses must be reasonable and
> necessary for that purpose.

Id. at 60-61.  "Whether the insured's site investigation expenses

are defense costs that the insurer must incur in fulfilling its

duty to defend must be determined objectively, and not

subjectively from the viewpoint of either the insurer or the

insured."  Id. at 62.

"In the general case, it is the insured that must carry

the burden of proof on the existence, amount, and reasonableness

and necessity of the site investigation expenses as defense

costs, and it must do so by the preponderance of the evidence."

Id. at 64.  "By contrast, in the exceptional case, wherein the

insurer has breached its duty to defend, it is the insured that

must carry the burden of proof on the existence and amount of the

site investigation expenses, which are then presumed to be

reasonable and necessary as defense costs, and it is the insurer

that must carry the burden of proof that they are in fact

unreasonable or unnecessary."  Id.  Here, defendant did not

breach its duty to defend and agreed, under a reservation of

1  rights, to provide a defense to the City's Cross-Complaint.

2         1.  Pre-Tender Costs

3        Aerojet first requires that "the site investigation

4  must be conducted within the temporal limits of the insurer's

5  duty to defend, i.e., between tender of the defense and

6  conclusion of the action."  Here, plaintiff tendered the defense

7  on January 27, 2012.  Invoice 50613104 is dated January 22,

8  2013,[5] (Docket 29-16), and is for work completed in November 2012

9  through January 2013, (Acosta Decl. ¶ 4 (Docket 29-15)).

10  Similarly, Invoice 50640959 is dated January 15, 2013, (Docket

11  No. 29-17), and is for services provided in November 2012 through

12  January 7, 2013, (Acosta Decl. ¶ 40).  It is therefore undisputed

13  that Invoices 50613104 and 50640959 satisfy the first Aerojet

14  requirement because they are for services provided after tender

15  of the defense and before completion of the underlying state

16  action.

17        While the specific invoices plaintiff submitted are

18  limited to post-tender costs, plaintiff argues defendant is also

19  obligated to cover pre-tender costs.  Generally, "under

20  California law, '[i]t is well understood . . . that an insurer's

21  duty does not arise until defense is tendered by the insured and

22  the known facts point to a potential for liability under the

23  policy.'"  Burgett, Inc. v. Am. Zurich Ins. Co., 875 F. Supp. 2d

24  1125, 1127 (E.D. Cal. 2012) (quoting Valentine v. Membrila Ins.

25          [5]  Plaintiff initially indicates in its brief that Invoice

26  50613104 is dated January 22, 2012, which is five days before
   plaintiff tendered the defense.  (See Pl.'s Mem. at 4:15.)  It

27  appears plaintiff merely misstated the year as the date on the
   invoice is January 22, 2013.

28

1  <u>Servs., Inc.</u>, 118 Cal. App. 4th 462, 473 (2004)) (alteration and

2  omission in original).  Insurance policies often seek to exclude

3  coverage for pre-tender expenses through a "no voluntary payment"

4  provision like the one included in the policy at issue in this

5  case.  (<u>See</u> Docket No. 28-7 ¶ 13 ("The insured shall not, except

6  at his own cost, voluntarily make any payment, assume any

7  obligation or incur any expense other than for such immediate

8  medical or surgical relief to others as shall be imperative at

9  the time of injury.").)

10         Nonetheless, California appellate courts have

11  recognized that an insured might be able to seek pre-tender

12  expenses despite inclusion of a "no voluntary payments"

13  provision.  In <u>Fiorito v. Superior Court</u>, the insureds retained

14  counsel upon being served with the summons and complaint and did

15  not tender the defense to the insurer until four months later

16  after they located and reviewed their insurance policies.  226

17  Cal. App. 3d 433, 438 (4th Dist. 1990).  Despite the provision

18  excluding voluntary payments, the insureds alleged they did not

19  voluntarily incur pre-tender defense costs because "they were

20  'compelled' to incur the pre-tender defense costs in order to

21  respond to legal process and to protect their legal interests."

22  <u>Id.</u>

23         The Fourth Appellate District held that the trial court

24  erred in finding that the insurer was not required to pay pre-

25  tender expenses as a matter of law because the insureds had

26  sufficiently "raise[d] a question as to the 'voluntariness' of

27  [their] actions in incurring pre-tender expenses."  <u>Id.</u> at 439;

28  <u>accord</u> <u>Shell Oil Co. v. Nat'l Union Fire Ins. Co.</u>, 44 Cal. App.

24

1    4th 1633, 1649 (2d Dist. 1996) (affirming finding after trial

2    that "defense expenditures incurred during a four-month interval

3    between service of summons and tender of defense" while the "the

4    insureds had 'searched for insurance policies that might provide

5    coverage or defense'" "were not barred from recovery, because

6    they were not voluntary").

7            Here, the City filed its Cross-Complaint on August 24,

8    2011, but plaintiff did not tender the defense until five months

9    later on January 27, 2012.  Plaintiff's attorney, William Brown,

10   indicates that he unsuccessfully searched for evidence of

11   plaintiff's insurance policies in 2008, again in 2011, and a

12   third time after the City filed its Cross-Complaint.  (Brown

13   Decl. ¶¶ 1-6 (Docket No. 32-9).)  Mr. Brown's paralegal explains

14   that, in January 2012, she located a reference to the insurance

15   policy in a correspondence from 1975 between the City and

16   plaintiff and that Mr. Brown's law firm was not aware of the

17   policy until that discovery.  (Depies Decl. ¶¶ 1, 3-4 (Docket No.

18   32-10).)

19           While this case is similar to Fiorito and Shell in that

20   there was a relatively short delay between service of the summons

21   and complaint and the tender because the insured had not yet

22   located the insurance policy, the insureds in those cases sought

23   pre-tender costs that were "involuntarily" incurred to "respond

24   to legal process and to protect their legal interests."

25   Fiorito, 226 Cal. App. 3d at 438; see Insua v. Scottsdale Ins.

26   Co., 104 Cal. App. 4th 737, 747 (2d Dist. 2002) (explaining that

27   the insureds in Shell argued they were "'compelled' to respond to

28   legal process and to protect their legal interests").  Here,

1   neither party has identified any pre-tender defense costs

2   plaintiff incurred to "respond to legal process and to protect

3   their legal interests."

4        The only costs discussed in both motions are

5   plaintiff's site investigations and the court therefore assumes

6   that pre-tender site investigation costs are the only pre-tender

7   costs at issue.  Not only are pre-tender site investigation costs

8   distinguishable from pre-tender costs to respond to legal process

9   and protect legal interests, Aerojet unequivocally limits the

10  inclusion of site inspections as defense costs to investigations

11  that occur "between tender of the defense and conclusion of the

12  action."  Aerojet, 17 Cal. 4th at 61; accord Foster-Gardner, Inc.

13  v. Nat'l Union Fire Ins. Co., 18 Cal. 4th 857, 886 (1998)

14  ("[S]ite investigation expenses incurred prior to the instigation

15  of a lawsuit against the insured are not defense costs the

16  insurer must incur . . . . because the insurer does not yet have

17  a duty to defend the insured.").  When the California Supreme

18  Court articulated this requirement, the lower appellate courts

19  had already decided Fiorito and Shell and thus the Supreme Court

20  could have included a similar exception, but did not.

21  Accordingly, the court must grant defendant's motion for summary

22  adjudication with respect to any pre-tender site investigation

23  costs.

24            2.   Reasonable and Necessary Effort to Avoid or

25                 Minimize Liability

26            a.   Compulsion by the CRWQCB

27        Next, the site investigation costs incurred "must

28  amount to a reasonable and necessary effort to avoid or at least

1  minimize liability." Aerojet-Gen. Corp., 17 Cal. 4th at 61.

2  Defendant first argues that the site inspections were not related

3  to defending against the City's Cross-Complaint because plaintiff

4  incurred those costs in response to the CRWQCB's orders.  The

5  California Supreme Court in Aerojet, however, emphasized that an

6  objective standard governs whether costs incurred were a

7  reasonable effort to minimize liability "even in the general

8  context of a governmental request or order for the insured to

9  conduct a site investigation and/or to incur site investigation

10  expenses." Id. at 63.  It does not matter, the Aerojet Court

11  explained, whether the insured incurred the site investigation

12  expenses to "resist liability," to "satisfy the government," for

13  both of those reasons, or for an entirely different reason.  Id.;

14  see id. at 66 ("What matters is what is done, not why.").  Under

15  this objective standard, it is simply irrelevant whether the

16  insured incurred costs for the inspection voluntarily in an

17  effort to minimize liability or involuntarily because the federal

18  or state government ordered it to do so.  Id. at 66.

19      Defendant attempts to distinguish this case from

20  Aerojet on the ground that the CRWQCB's Orders mandated the site

21  inspections before plaintiff tendered the defense of the City's

22  Cross-Complaint and thus plaintiff's "obligation to investigate

23  and remediate the Site existed independently of, and years

24  before, the City filed its cross-complaint." (Def.'s Mem. at

25  13:6-15.)  While Aerojet requires that the site investigations

26  occur after the tender of the defense, nothing in the opinion

27  suggests that a government action mandating the same site

28  investigation must also occur after the tender.  Adopting

defendant's position would abandon the objective inquiry <u>Aerojet</u>

requires because the court would be speculating that plaintiff

incurred the site investigation costs because it had a pre-

existing obligation to do so.  <u>Aerojet</u> rejected an inquiry into

the "purely fictive" "mind and heart" of a government insured and

emphasized that the controlling inquiry "is whether the site

investigation expenses would be incurred against liability by a

reasonable insured under the same circumstances."  <u>Aerojet</u>, 17

Cal. 4th at 63 (citation omitted).[6]

> b.   <u>Reasonable and Necessary Effort to Avoid or</u>
>
> <u>Minimize Liability in Light of the</u>
>
> <u>Allegations in the Cross-Complaint</u>

In the Cross-Complaint, the City alleges twelve claims

against plaintiff: (1) indemnity/contribution under the Hazardous

Substance Account Act; (2) declaratory relief under the

California Hazardous Substances Accounting Act; (3)

indemnity/contribution under the Porter Cologne Act; (4)

declaratory relief under the Porter Cologne Act; (5) private

---

[6]    Nor does <u>Foster-Gardner, Inc.</u> or <u>County of San Diego v.
Ace Property & Casualty Ins. Co.</u>, 37 Cal. 4th 406 (2005), support
defendant's position.  In <u>Foster-Gardener Inc.</u>, the California
Supreme Court held that a policy's provision for defense of a
"suit" did not extend to "environmental agency activity prior to
the filing of a complaint," and "site investigation expenses
incurred prior to the instigation of a lawsuit against the
insured are not defense costs the insurer must incur" because a
duty to defend under the policy did not arise until the "suit"
commenced.  18 Cal. 4th at 860-61, 886.  <u>Ace Property & Casualty
Ins. Co.</u> dealt with excess indemnity coverage, not defense costs,
and held that coverage for "damages" did not extend to "costs and
expenses associated with responding to administrative orders to
clean up and abate soil or groundwater contamination outside the
context of a government-initiated lawsuit seeking such remedial
relief . . . ."  37 Cal. 4th at 406.

1   nuisance; (6) private nuisance per se; (7) public nuisance; (8)

2   public nuisance per se; (9) breach of contract; (10) dangerous

3   condition of public property; (11) express

4   indemnity/contribution; and (12) equitable

5   indemnity/contribution.  The Cross-Complaint alleges that

6   plaintiff has operated the Geer Landfill since approximately 1970

7   and that it caused and is responsible for the "hazardous

8   substance contamination in and around the Greer Landfill" and is

9   "liable for the removal and remedial action costs incurred by"

10  the City.  (Menacher Decl. Ex. D ("City's Cross-Compl.") ¶¶ 11-

11  13, 24 (Docket No. 29-7).)  The Cross-Complaint further alleges

12  that the contamination is "continuing and abatable" and

13  "[b]ecause of the nature, extent and magnitude of the

14  contamination at and/or near Greer Landfill is not fully known at

15  this time, investigatory and remedial work has not been completed

16  and may occur in the future" and the City "may incur necessary

17  response costs, including but not limited to investigatory,

18  monitoring and remedial expenses . . . in the future." (City's

19  Cross-Compl. ¶¶ 20, 31).

20          Resolution of these claims will require findings about

21  the extent and cause of the contamination.  In light of

22  plaintiff's claims and the equitable considerations required to

23  allocate costs, some site investigation expenses would be

24  incurred against liability by a reasonable insured because doing

25  so allows the insured to identify the concentration and extent of

26  the contamination and the cause of the contamination.  For

27  example, Gregory Acosta, who was the project manager of the

28  investigation culminating in the Plume Investigation Report,

1    indicates that the "purpose of the Plume Investigation Report was

2    to (1) better define the nature and extent of the groundwater

3    impacts, especially in the deeper zone, (2) to evaluate the area

4    west of the Toulumne River with respect to landfill-related

5    impacts and (3) to provide a groundwater model, both conceptual

6    and numerical, for the groundwater system at the Site." (Acosta

7    Decl. ¶¶ 2, 13.)  He further explains that the work billed in

8    Invoices 50643104 and 50640949 "included an investigation into

9    the vertical and lateral extent of the groundwater impacts at the

10   Site and the creation of a groundwater model both conceptual and

11   numerical for groundwater system at the Site."  (Id. ¶¶ 6, 11.)

12                   c.   Inadequacy of Invoices

13             The evidence before the court is inadequate, however,

14   to determine as a matter of law whether all of the services in

15   Invoices 50643104 and 50640949 would have been "incurred against

16   liability by a reasonable insured under the same circumstances."

17   Aerojet, 17 Cal. 4th at 63.  The descriptions of the billed work

18   are extremely vague.  Invoice 50614103 attributes $32,306.30 to

19   "Task 100," which is described as "ROUTINE LFG SERVICES" and

20   $69,822.55 to "Task 200," which is described as "NON-ROUTINE

21   GROUNDWATER/INVESTIGATIVE SERVICES."  (Docket No. 29-16.)  In his

22   declaration, Acosta provides a short explanation of the services

23   included in the Invoices, but it too lacks adequate detail to

24   ensure that all costs in the Invoices are limited to site

25   investigations that were reasonably and necessarily conducted to

26   defend against the City's Cross-Complaint.  (See Acosta Decl. ¶¶

27   5-6.)

28             While site investigation expenses may "do double duty"

30

by constituting defense costs and fulfilling a separate

obligation imposed by state or federal environmental laws,

Aerojet, 17 Cal. 4th at 65-66, clean-up costs are not defense

costs simply because they "minimize liability" by remediating the

contamination. For example, defense costs may "promote removal

and remediation[] by enabling [the responsible party] to

determine how to neutralize the substance in question" or

"minimize liability[] by making it possible for it to show that

it was not in fact the source of the discharge." Id. Costs are

no longer site investigation costs, however, when they take the

next step of remediating the contamination even though

remediation could have the ultimate benefit of "minimizing

liability." Cf. id. at 61 n.13 ("[A]t least generally, the same

costs cannot be both indemnification costs and defense costs.").

It is unclear from the invoices whether all of the

costs are attributable to reasonable investigations performed to

defend against the City's Cross-Complaint or whether some of the

costs were part of on-going remediation and clean-up efforts

entirely unrelated to any sudden and accidental discharges at

issue in the City's Cross-Complaint. (See, e.g., Docket No. 28-

13 at 11 (requiring plaintiff to "maintain in good working order

any facility, control system, or monitoring device installed to

achieve compliance with the waste discharge requirements,"

"conduct routine maintenance of the final cover, areas with

interim cover, the precipitation and drainage control facilities,

the groundwater, unsaturated zone and landfill gas monitoring

systems, the landfill has extraction system, and any facilities

associated with corrective action").)

1        Plaintiff also references 107 other invoices that it

2   allegedly submitted to defendant for payment, but has not

3   submitted those invoices to the court and it is unclear whether

4   their motion for summary judgment is limited to Invoices 50643104

5   and 50640949 or extends to 107 additional invoices that are not

6   before the court.  Without the ability to meaningfully review the

7   work performed, the court cannot determine as a matter of law

8   that the charges were limited to investigations that a reasonable

9   insured would have performed to defend against the City's Cross-

10  Complaint.

11       Similar to <u>Aerojet</u>, "[w]hether and to what extent [any

12  site investigation expenses] actually were" reasonable and

13  necessary to defend against the City's Cross-Complaint remains an

14  issue for trial.  17 Cal. 4th at 65.  Accordingly, because

15  plaintiff has not shown as a matter of law that the invoices

16  defendant did not pay were defense costs under <u>Aerojet</u>, the court

17  must deny plaintiff's motion for summary judgment with respect to

18  those defense costs.

19       IT IS THEREFORE ORDERED that plaintiff's motion for

20  summary judgment be, and the same hereby is, GRANTED with respect

21  to defendant's duty to defend under the policy and DENIED in all

22  other respects; and defendant's motion for summary judgment be,

23  and the same hereby is, GRANTED with respect to any pre-tender

24  costs and DENIED in all other respects.

25       IT IS FURTHER ORDERED that discovery is reopened for

26  forty-five days from the date of this Order for the limited

27  purpose of defendant deposing Tom Bower.

28  ///

32

1  Dated:   November 5, 2015

2

3  WILLIAM B. SHUBB
   UNITED STATES DISTRICT JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28